**<u>NOT YET SCHEDULED FOR ORAL ARGUMENT</u>**

**No. 25-2411, 25-2418**

**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

---

**JANE DOES 1-10,**
***Plaintiffs-Appellants*,**

**v.**

**MG FREESITES LTD., D/B/A/ PORNHUB.COM; HAMMY MEDIA LTD., D/B/A/ XHAMSTER.COM; MINDGEEK S.A.R.L.; TRAFFICSTARS LTD.; WISEBITS IP LTD.,**
***Defendants-Appellees*,**

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA (SPARTANBURG)**
Case Nos. 7:20-cv-00947-DCC, 7:21-cv-03193-DCC
(The Honorable Donald C. Coggins Jr.)

---

# OPENING BRIEF FOR DEFENDANTS-APPELLEES

---

*


**CIAMPA FRAY-WITZER, LLP**
Evan Fray-Witzer
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Evan@CFWLegal.com
*Attorneys for Defendants-Appellees Hammy Media, Ltd., d/b/a xHamster.com; Trafficstars Ltd; Wisebits IP, Ltd*

**TURNER, PADGET, GRAHAMAND LANEY,P.A.**
Mark Goddard
R. Hawthorne Barrett
1901 Main Street, 9th Floor
Columbia, SC 29201
Telephone: 803-227-4334
mgoddard@turnerpadget.com
tbarrett@turnerpadget.com
*Attorneys for Defendant MG Freesites Ltd and MindGeek S.à r.l.*


September 9, 2026

***Additional counsel listed on inside cover***

**BOSTON LAW GROUP, PC**
Valentin D. Gurvits
Frank Scardino
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
vgurvits@bostonlawgroup.com
frank@bostonlawgroup.com
*Attorneys for Defendants-Appellees Hammy Media, Ltd., d/b/a xHamster.com; Trafficstars Ltd; Wisebits IP, Ltd*

**METCALFE & ATKINSON, LLC**
Hannah Rogers Metcalfe
1395 South Church Street
Greenville, South Carolina 29605
Telephone: 864-214-2319
hmetcalfe@malawfirmsc.com
*Attorneys for Defendants-Appellees Hammy Media, Ltd., d/b/a xHamster.com; Trafficstars Ltd; Wisebits IP, Ltd*

**MITCHELL SILBERBERG & KNUPP LLP**
Theresa B. Bowman
1818 N Street NW, 7th Floor
Washington, DC 20036
Telephone: 202-355-7900
tbb@msk.com
Marc E. Mayer
Emily F. Evitt
2049 Century Park East
18th Floor
Los Angeles, California 90067
Telephone: 310-312-2000
mem@msk.com
efe@msk.com
*Attorneys for Defendants-Appellees MG Freesites Ltd and MindGeek S.à r.l*

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ........ iii

PRELIMINARY STATEMENT ........ 1

COUNTER-STATEMENT OF THE ISSUES ........ 4

STATEMENT OF THE CASE ........ 5

I. FACTUAL HISTORY ........ 5

A. MindGeek and Pornhub. ........ 5

1. The Upload of Content to Pornhub by Third Parties. ........ 5
2. MindGeek's Efforts To Moderate User-Uploaded Content. ........ 7

B. The XHamster Defendants and xHamster. ........ 8

C. Appellants and the Videos at Issue. ........ 10

D. Third Parties Uploaded the Videos to Appellees' Websites. ........ 12

E. Appellees Receive Notice, Promptly Remove the Videos, and Cooperate With Authorities. ........ 14

II. PROCEDURAL HISTORY ........ 15

A. The First Five Complaints. ........ 16

B. The District Court's June 16, 2021 Dismissal Order. ........ 17

C. Hammy's Motion for Judgment on the Pleadings. ........ 18

D. The Fifth Amended Complaint. ........ 18

E. The District Court Grants Summary Judgment. ........ 19

SUMMARY OF ARGUMENT ........ 22

ARGUMENT ........ 24

I. STANDARD OF REVIEW ........ 24

**TABLE OF CONTENTS**
**(continued)**

**Page**

II. APPELLANTS MAY NOT RAISE NEW THEORIES ON APPEAL ....... 25

III. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT ON APPELLANTS' FALSE LIGHT CLAIMS .................... 26

A. The District Court Correctly Applied Section 230, and Appellants Now Raise Very Different Arguments on Appeal. ............................ 26

B. Appellants' New Material Contribution Arguments Are Contradicted By Well-Established Precedent. .................................. 30

1. The Decision "Whether To Publish" Cannot Constitute "Material Contribution" According To Precedent. ...................30

2. The Appearance Of Other Adult Content, Advertisements, And Category Titles Alongside The Videos Does Not Constitute Material Contribution. ............................................37

3. An Inapposite Line of Magazine Cases Does Not Provide Support For Appellants' Unworkable Theories. .......................43

C. Appellants Failed To Properly Plead Their False Light Claims. ....... 44

IV. THE DISTRICT COURT PROPERLY DISMISSED APPELLANTS' PRIVACY CLAIMS........................................................................ 45

A. The Court Correctly Rejected Appellants' "Agency" Theory. .......... 46

B. Even if Properly Submitted, Appellants' New Privacy Claims Clearly Fall Within Section 230 Immunity. ...................................... 50

CONCLUSION ......................................................................................... 54

REQUEST FOR ORAL ARGUMENT ................................................................ 56

CERTIFICATE OF COMPLIANCE .................................................................. 58

CERTIFICATE OF SERVICE .............................. **Error! Bookmark not defined.**

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Asia Econ. Inst. v. Xcentric Ventures LLC*,
2011 WL 2469822 (C.D. Cal. May 4, 2011) .......... 36

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) .......... 42

*Ben Ezra, Weinstein, & Co. v. America Online Inc.*,
206 F.3d 980 (10th Cir. 2000) .......... 51

*Braun v. Flynt*,
726 F.2d 245 (5th Cir. 1984) .......... 43

*Carafano v. Metrosplash.com, Inc.*,
339 F.3d 1119 (9th Cir. 2003) .......... 51

*Chalifoux v. Wetzel Cnty. Hosp., Inc.*,
2025 WL 1879597 (4th Cir. July 8, 2025) .......... 26

*Doe v. Friendfinder Network, Inc.*,
540 F. Supp. 2d 288 (D.N.H. 2008) .......... 36

*Doe v. GTE Corp.*,
347 F.3d 655 (7th Cir. 2003) .......... 53

*Doe v. Internet Brands*,
824 F.3d 846 (9th Cir. 2016) .......... 42

*Doe v. Reddit, Inc.*,
2021 WL 5860904 (C.D. Cal. Oct. 7, 2021) .......... 36

*Doe v. Smith*,
429 F.3d 706 (7th Cir. 2005) .......... 54

*Doe v. WebGroup Czech. Republic*,
2026 WL 2334146 (9th Cir. Aug. 12, 2026) .......... 38

*Doe v. Webgroup Czech Republic, A.S., et al.*,
2024 WL 3533426 (C.D. Cal. July 24, 2024) .......... 36

*Douglass v. Hustler Mag., Inc.*,
769 F.2d 1128 (7th Cir. 1985) .......... 43

## TABLE OF AUTHORITIES
continued

**Page(s)**

*Estate of Alvarez by & through Galindo v. Rockefeller Found.*,
96 F.4th 686 (4th Cir. 2024) ....................49

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
521 F.3d 1157 (9th Cir. 2008) ....................42

*Fernander v. Thigpen*,
293 S.E.2d 424 (S.C. 1982) ....................49

*Gaughan v. Barounis*,
2025 N.Y. Misc. LEXIS 17243 (N.Y. Dec. 18, 2025) ....................39

*Henderson v. Source for Pub. Data, L.P.*,
53 F.4th 110 (4th Cir. 2022) ....................passim

*Hicks v. Ferreyra*,
965 F.3d 302 (4th Cir. 2020) ....................24, 25, 30, 50

*HomeAway.com, Inc. v. City of Santa Monica*,
918 F.3d 676 (9th Cir. 2019) ....................43

*Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*,
329 F.3d 359 (4th Cir. 2003) ....................24

*J.R. v. Mancino*,
2024 WL 3048368, at *1, 3 (D.S.C. May 31, 2024) ....................31

*Jones v. Dirty World Ent. Recordings LLC*,
755 F.3d 398 (6th Cir. 2014) ....................passim

*Kimzey v. Yelp! Inc.*,
836 F.3d 1263 (9th Cir. 2016) ....................23, 32

*Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*,
43 F.3d 922 (4th Cir.1995) ....................24

*Marsh v. Hancock*,
342 S.E.2d 607 (S.C. 1986) ....................45

## TABLE OF AUTHORITIES
continued

**Page(s)**


*Morton v. Twitter, Inc.*,
2021 WL 1181753 (C.D. Cal. Feb. 19, 2021) ....................35

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
591 F.3d 250 (4th Cir. 2009) ....................passim

*Norton v. Meta Platform, Inc.*,
2026 WL 1963120 (N.D. Cal. July 7, 2026) ....................51

*O'Kroley v. Fastcase, Inc.*,
831 F.3d 352 (6th Cir. 2016) ....................51

*Parker v. Google, Inc.*,
422 F. Supp. 2d 492 (E.D. Pa. 2006) ....................52

*Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*,
130 F.3d 88 (4th Cir.1997) ....................24

*Pinder v. 4716 Inc.*,
494 F. Supp. 3d 618 (D. Ariz. 2020) ....................44

*Poole v. Tumblr, Inc.*,
404 F. Supp. 3d 637 (D. Conn. 2019) ....................51, 52

*Pueschel v. United States*,
369 F.3d 345 (4th Cir. 2004) ....................49

*Ripple Labs Inc. v. YouTube LLC*,
2020 WL 6822891 (N.D. Cal. Nov. 20, 2020) ....................39

*Russell Willis, Inc. v. Page*,
48 S.E.2d 627 (S.C. 1948) ....................45

*Sable Commc'ns of California, Inc. v. F.C.C.*,
492 U.S. 115 (1989) ....................36

*Stevenson v. Emerson Elec. Corp.*,
333 S.E.2d 355 (S.C. Ct. App. 1985) ....................45

**TABLE OF AUTHORITIES**
continued


**Page(s)**

*Stewart v. Hall*,
770 F.2d 1267 (4th Cir. 1985) ....................24

*Tarashuk v. Givens*,
53 F.4th 154 (4th Cir. 2022) ....................25

*Thompson v. Dulaney*,
970 F.2d 744 (10th Cir.1992) ....................54

*U.S. ex rel. Bunk v. Gosselin World Wide Moving, N.V.*,
741 F.3d 390 (4th Cir. 2013) ....................49

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*,
478 F.3d 413 (1st Cir. 2007)....................52

*W. Virginia Univ. Hosps., Inc. v. Casey*,
499 U.S. 83 (1991)....................4

*Weeks v. Union Camp Corp.*,
215 F.3d 1323, 2000 WL 727771 (4th Cir. 2000)....................54

*Wheatley v. Wicomico Cty.*,
390 F.3d 328 (4th Cir. 2004) ....................25, 45

*Williams v. Prof'l Transp. Inc.*,
294 F.3d 607 (4th Cir. 2002) ....................25

*Wood v. Hustler Mag., Inc.*,
736 F.2d 1084 (5th Cir. 1984) ....................43

*Zeran v. Am. Online, Inc.*,
129 F.3d 327 (4th Cir. 1997) ....................1, 31, 44, 50

**STATUTES**

47 U.S.C.
§ 230....................passim
§ 230(b)(2) ....................31
§ 230(e)(4) ....................52

## TABLE OF AUTHORITIES
continued

**Page(s)**

Section 2511(1)(c) of the Electronic Communications Privacy Act ........................52

S.C. Code Ann. § 19-3-120..........................................................................................44

### OTHER AUTHORITIES

S.C. R. Civ. P. 44(d) ....................................................................................................44

## PRELIMINARY STATEMENT

This case, as framed by Appellants, presents an impractical invitation for this Circuit to deviate from decades of precedent (including its own) faithfully effectuating Congress's intent that websites be immune for using neutral tools to publish third-party content. Appellants further invite this Court to decide novel legal theories presented for the first time on appeal. The Court should decline both invitations.

In enacting the statutory provision at issue—the Communications Decency Act, 47 U.S.C. § 230 ("CDA" or "Section 230")—Congress considered that "[i]t would be impossible for" websites that publish third-party content "to screen each of their millions of postings" to account for "the specter of tort liability" without causing a monumental "chilling effect" in "an area of… prolific speech." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997). Congress determined "the weight of the speech interests implicated" required extending immunity to websites in certain circumstances, because they were (and remain) some of the most consequential town squares of the modern age. *Id.* That highly impactful decision has resulted in a consistent body of case law spanning decades. Accordingly, any significant alteration to the existing balance created by Section 230 must be made by Congress, not the courts.

Due regard for Congressional intent, and the 30 years of CDA case law that has followed, is irreconcilable with the radical approach Appellants propose in their Opening Brief. Appellants would have this Court strip Section 230 protections from vast segments of the internet based solely on a website's overall subject matter and its use of neutral organizational tools. Tellingly, their only support for this proposal is a line of ***pre-CDA print magazine cases***. The entire point of the CDA was to treat online publishers differently than print publishers.

To be clear, the issue presented here is not whether Section 230 protection should be afforded to a website if it materially contributes to the creation of illegal content. In this case, Appellees host consensual adult entertainment content posted by third parties. The videos at issue passed moderation practices doing the very job that Congress recognized is so difficult that it merited enacting Section 230—screening millions of posts and removing content that violates Appellees' terms of service. Appellees promptly removed the videos after learning they were non-consensual.

Below, Appellants' primary case theory was that Appellees should not be immune from suit because they allegedly solicited and encouraged nonconsensual content from unrelated individuals like Defendant Collins Murphy (who allegedly created the videos) and the unknown third parties who posted them. After six iterations of pleading, multiple 30(b)(6) and expert depositions, and thousands of

pages of discovery, that case theory ultimately failed because it proved to be untrue. Appellants also argued below that the videos were so obviously nonconsensual that Appellees were negligent in their content moderation practices. That theory also failed, again because it lacked any factual or legal support.

On appeal, Appellants' new counsel have abandoned both these theories. Indeed, the case Appellants present on appeal bears only passing resemblance to what they argued to the district court for more than five years. For example, over the course of more than 650 filings in the district court, the Electronic Communication Privacy Act ("ECPA"), the statute under which Appellants now seek to resurrect their Wrongful Disclosure Claim from their Fourth Amended Complaint, was never once mentioned. Nor was the ECPA raised in a single hearing, deposition, expert report, or discovery response. And, with respect to the only other claim for which Appellants seek review (False Light), Appellants' arguments are significantly different. Appellants argued below that what made the videos unlawful was their nonconsensual recording, and presented expert testimony that purported to establish Appellees should have known this from the videos themselves. Appellants now seemingly argue the opposite: that the videos place them in an actionable false light because they allegedly depict consensual adult entertainment.

Even if this Court were inclined to break with its long-standing admonition that it will not consider arguments raised for the first time on appeal (absent

exceptional circumstances), statutes like Section 230 must ultimately be interpreted in the way "which fits most logically and comfortably into the body of" existing law "because it is our role to make sense rather than nonsense out of the *corpus juris*." *W. Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 100-01 (1991). Appellants novel attempts to hold Appellees liable for Defendant Murphy's vile actions would upend nearly 30 years of CDA precedent and must be rejected.

## **COUNTER-STATEMENT OF THE ISSUES**

1. Did the District Court err in concluding that Appellants' claim for "false light" was barred by Section 230 where there was no factual dispute that the videos depicting Appellants were created and uploaded to Appellees' websites by independent third parties, and Appellees did not alter or modify the videos or otherwise contribute to what made them unlawful.

2. Did the District Court err in dismissing Appellants' invasion of privacy claims, where such claims were premised on implausible and factually unsupported allegations that Defendant Collins Murphy acted as the "agent" or "joint venture partner" of Appellees when he videotaped Appellants (seven years before the videos were uploaded to Appellees' websites).

# STATEMENT OF THE CASE

## I. FACTUAL HISTORY

### A. MindGeek and Pornhub.

In 2019, Appellee MG Freesites Ltd operated a portfolio of websites that hosted adult-oriented content (*e.g.*, videos), including the popular content-sharing platform Pornhub.com. *See* Declaration of Andreas Andreou (ECF 475-3, "Andreou Decl.") ¶5. Appellee MindGeek S.à r.l. was the corporate parent of MG Freesites Ltd and various other entities. (MG Freesites Ltd and MindGeek S.à r.l. are collectively referred to as "MindGeek.")

In 2019, Pornhub hosted user-uploaded adult-oriented content. *See* Declaration of Andreas Ignatiou (ECF 475-4, "Ignatiou Decl.") ¶5. Subject to their compliance with certain requirements, members of the public could upload content to Pornhub for others to view. *Id.* ¶6. In this respect, Pornhub was similar to other user-generated content platforms such as YouTube and Twitter. In 2019 alone, users uploaded over ***6 million*** videos to Pornhub. *See Id*. ¶5.

#### 1. The Upload of Content to Pornhub by Third Parties.

In 2019, to upload content to Pornhub, members of the public had to create an account with Pornhub and agree to the Terms of Service ("TOS"). *Id.* ¶7, Ex. A. Users completed this process online via Pornhub, without communicating with any representative of MindGeek. *Id.* Pursuant to the TOS, users acknowledged and agreed that "[they] own[ed] or ha[d] the necessary licenses, rights, consents, and

permissions to publish [c]ontent [they] submit[ted] [to Pornhub]." *Id.* ¶8, Ex. A at 7. The TOS also expressly prohibited the upload of content that "violate[d] any law (including without limitation laws related to torts, contracts, patents, trademarks, trade secrets, copyrights, defamation, obscenity, pornography, rights of publicity or other rights) or encourage[d] or provide[d] instructions to another to do so;" content "for which [the user had] not maintained written documentation sufficient to confirm that all subjects of [its] posts [were], in fact, over 18 years of age (or older in any other location in which 18 [was] not the minimum age of majority);" and content that was "obscene, illegal, unlawful, defamatory, libelous, harassing, hateful, racially or ethnically offensive, or encourage[d] conduct that would be considered a criminal offense, [gave] rise to civil liability, violate[d] any law, or [was] otherwise inappropriate." *Id.* ¶8, Ex. A at 11.

Subject to the foregoing requirements and restrictions, users alone decided what content to upload to Pornhub. *Id.* ¶12. Apart from providing a platform, MindGeek did not play any role in the upload of users' content or the creation of such content. As part of the upload process, users had to select one or more relevant "categories" from a pre-set list and create "tags" and "titles" for their content. *Id.* ¶¶13-17.[1] The purpose of these "categories" and "tags" was to catalog and organize

[1] In rare instances, tags were automatically populated based on the users' selected category. For example, if the user selected the category "POV," the tag "Point of View" would apply. *Id.* ¶15.

the content, and to help ensure that users browsing or searching for a particular type of content were able to find what they were looking for (to the extent that it existed). *Id.* ¶13; *accord* Declaration of Marc E. Mayer (ECF 475-2, "Mayer Decl."), Ex. A (Transcript of Deposition of Ramsey Belmaaza ("Belmaaza Tr.")) at 62:18-63:1. In an effort to avoid the upload of potentially noncompliant content, MindGeek maintained a list of "banned words." *See* Ignatiou Decl. ¶16. Any title or tag containing a "banned word" was automatically rejected. *Id.* ¶¶15, 17. Also during the upload process, users had to upload their own custom "thumbnails" or select from thumbnails automatically generated from existing content, which were displayed for preview purposes on Pornhub. *Id.* ¶18.

**2. MindGeek's Efforts To Moderate User-Uploaded Content.**

Once users uploaded their content and provided the requisite items (*i.e.*, categories, tags, title, thumbnails), MindGeek used a combination of human reviewers and automated tools to moderate the content available on Pornhub. *Id.* ¶¶19-21. Every piece of user-uploaded content was reviewed by at least one moderator before it went "live" on Pornhub. *Id.* ¶22. The moderators were trained to identify—and reject—any content that may have been illegal or otherwise violated the TOS, including nonconsensual content. *Id.* ¶¶23-25. MindGeek also deployed a robust suite of tools designed to automatically detect and prevent the publication (and re-publication) of potentially noncompliant content. *Id.* ¶27.

If user-uploaded content was not rejected during the moderation process, it went "live" on Pornhub. *Id.* ¶28. As an additional layer of quality control, MindGeek had policies and procedures to ensure the prompt detection and removal of any noncompliant content that was inadvertently published on Pornhub. *Id.* For example, MindGeek audited recently-posted content. *Id.* ¶29. MindGeek also had a "flagging" system and a robust "notice-and-takedown" system, which enabled members of the public to report and/or request removal of potentially illegal or noncompliant content on Pornhub. *Id.* ¶¶30-31. Any reported content that was found to be potentially noncompliant was permanently removed from Pornhub. *Id.* ¶31.

**B. <u>The XHamster Defendants and xHamster.</u>**

In 2019, Appellee Hammy Media Ltd. ("Hammy") operated the website xHamster.com ("xHamster"), which hosted adult-oriented content. 30(b)(6) Deposition Transcript of Hammy Media Ltd. (ECF 479-12, "Hammy Tr.") 112:4-12. The content on xHamster was not created by Hammy, but rather was uploaded by its users. Declaration of Mardiros Haladjian (ECF 174-2, "Haladjian Decl.") ¶15. XHamster hosts more than 7,895,000 videos, and users upload approximately 1,000 videos a day. *Id.* ¶16.

In 2019 (and today), when users uploaded videos to xHamster, they created the title and description for the video and selected one or more categories from a pre-

set list. Hammy. Tr. 95:4-7; Hammy Media Ltd. Answers to Interrogatories, (ECF 479-14, "Int. Ans.") at 5. There were thousands of available categories for users to choose from when uploading a video. ECF 479-15. Once a user selected a category or categories for a video, Hammy did not change those selections. Hammy Tr. 148:21-149:11. In addition, when a user uploaded a video, xHamster's automatic tagging system suggested certain tags based on information provided by the uploader in the description and title of the video. The tag suggestions were not random, but based on the title, description, and categories specified by the uploader. Int. Ans. at 5. Ultimately, titles, descriptions, categories, and tags were all assigned to each video by the uploader without Hammy's participation. *Id.* At the time of upload, a user was also given the opportunity to upload a "thumbnail" from the video.[2] Hammy Tr. 137:16-138:1. If the user did not select a thumbnail, the xHamster's software randomly selected an image from the video as the thumbnail. *Id.* 138:2-11.

XHamster was (and remains) free to access. Haladjian Decl. ¶10. The website is supported entirely by third-party advertising. *Id.*; Int. Ans. at 38. Advertising is placed on xHamster through a third-party ad broker company, TrafficStars.[3] Haladjian Decl. ¶11. TrafficStars Answers to Interrogatories (ECF 477-14, "TrafficStars Int. Ans.") at 7. In 2019, xHamster was one of more than 3,000

---

[2] A thumbnail is nothing more than a capture of a single frame of a video.

[3] Appellants are not appealing the decisions in favor of TrafficStars or Wisebits. App. Br. at 35, n.7.

websites for which TrafficStars provided advertising. Declaration of Dorothea Leonidou (ECF 477-12), ¶11. TrafficStars had no knowledge of the content that appeared alongside its advertisements. *Id.* at ¶16. In 2019, TrafficStars placed a total of 625,502,467,512 advertisements on its clients' websites. *Id.*; TrafficStars Int. Ans. at 4.

### C. **Appellants and the Videos at Issue.**

Appellants are ten women who allege they were surreptitiously recorded over a decade ago in a locker room at Limestone College. *See* Fifth Amended Complaint (ECF 193, "5AC"); IUP (No. 7:21-cv-03193-DCC) Dkt. 91 ("IUP Compl."). Nine of the Appellants (*i.e.*, in the 2020 action) were student-athletes at Bellarmine University who visited Limestone on or about October 5, 2012. *See* 5AC ¶72. The tenth Appellant (*i.e.*, in the 2021 action) ("IUP Doe") was a student-athlete at Indiana University of Pennsylvania who visited Limestone on or about September 8, 2013. *See* IUP Compl. ¶67. Appellants were adults at the time of the alleged incidents. *See* Mayer Decl., Exs. B-C. In the videos at issue (the "Videos"), Appellants are shown in various states of undress while engaged in ordinary post-game locker room activities (*e.g.*, changing clothes). *See* Mayer Exs. D-F. None of the Videos depict sexual activity. *See id.*; *see also* Jane Doe ("JD")1 Tr. 100:11-18; JD2 Tr. 129:5-18; JD3 Tr. 118:12-19; JD4 Tr. 197:17-198:22; JD5 Tr. 189:23-190:5; JD6 Tr. 185:3-11; JD7 Tr. 224:15-22; JD8 Tr. 110:23-111:6; JD9 Tr. 157:17-24; JD10 Tr. 30:13-

20.

The Videos allegedly were recorded by Collins Murphy ("Murphy"), a former employee of Limestone.[4] *See* 5AC ¶78. Murphy has not denied the allegation, but has asserted his Fifth Amendment right against self-incrimination. *See* Mayer Ex. Q (Transcript of Deposition of Collins Murphy ("Murphy Tr.")) 77:18-78:10.

None of the Appellees had any role in creating the Videos nor any connection to Murphy. *See* Ignatiou Decl. ¶¶34-35; District Court September 3, 2025 Opinion and Order granting Defendants summary judgment (ECF 635, the "Order") at 37, 62-63. Appellants admitted that they had no evidence or knowledge of Murphy ever communicating with Hammy[5] or MindGeek or receiving any form of compensation from Hammy or MindGeek.[6] Before this lawsuit, Appellees did not have any knowledge of Murphy nor any reason to know that Murphy (or anyone else) had hidden a camera in a locker room at Limestone. Ignatiou Decl. ¶¶34-35; Order at

---

[4] Murphy and Limestone were defendants in the district court action but are not parties to this appeal.

[5] JD1 Tr. 33:19-34:2, 119:20-120:2; JD2 Tr. 35:4-12, 148:19-149:1; JD3 Tr. 37:17-24, 132:21-133:6; JD4 Tr. 42:7-10, 210:13-211:2, 223:22-224:2; JD5 Tr. 43:23-44:11, 208:10-21; JD6 Tr. 32:17-33:2, 205:3-14; JD7 Tr. 34:5-14, 241:12-23; JD8 Tr. 36:20-37:2, 120:5-14; JD9 Tr. 40:20-23, 42:16-43:7, 177:19-178:3; JD10 Tr. 34:14-22, 147:18-148:2.

[6] *See* JD1 Tr. 121:15-122:14; JD2 Tr. 150:16-151:14; JD3 Tr. 134:22-135:20; JD4 Tr. 212:14-213:15; JD5 Tr. 211:9-213:11; JD6 Tr. 208:1-24; JD7 Tr. 247:4-11, 248:10-249:10; JD8 Tr. 122:4-123:2; JD9 Tr. 182:14-184:13; JD10 Tr. 151:16-153:1).

60-61.

**D. <u>Third Parties Uploaded the Videos to Appellees' Websites.</u>**

Approximately six years after the recordings were created, the Videos—eight in total, each containing clips from the same recordings—were uploaded to Pornhub and xHamster (collectively, the "Websites") by third-party users. *See* Ignatiou Decl. ¶36, Ex. B; Haladjian Decl., ¶¶15-21; Order at 3-4. On August 8, 2019, the user account "cwdistribution" uploaded six Videos to Pornhub. Order at 3. On August 30, 2019 and September 4, 2019, the user account "LordFauger18" (together with cwdistribution, the "Uploaders") uploaded two more Videos to Pornhub. *Id.* In 2019, certain of the Videos were uploaded to xHamster by a user with the username "cwdistribution." *Id*. at 4.

Apart from the fact that they uploaded content to Pornhub (and thus had created accounts with the Website), the Uploaders had no relationship with MindGeek. Ignatiou Decl. ¶¶38-39. They were never employed by MindGeek. *Id.* ¶38. Nor did they ever communicate with MindGeek. *Id.* Although LordFauger18 enrolled in a revenue-sharing program offered to all members of the public, he never received payment from MindGeek in connection with the Videos (or any other content). *Id.* ¶39.

For its part, Hammy has never paid any compensation to "cwdistribution."

Haladjian Decl. ¶25.[7] Indeed, in 2019, when the Videos were uploaded, Hammy did not have a program in place to pay any uploaders or provide any type of compensation or incentives for uploading content. Hammy Tr. 63:9-25, 145:4-19. Hammy has never had any written or verbal communications with "cwdistribution." Haladjian Decl. ¶26.

The Uploaders also had no connection to Murphy. *See* Murphy Tr. 79:16-21, 91:1-2, 93:16-94:13, 98:21-99:6, 99:18-100:3. There is no evidence that they ever communicated with Murphy, much less that they obtained the Videos from him. While the manner by which the Uploaders obtained the Videos is unknown, the Videos were available online for years before the Uploaders uploaded them to the Websites. For example, by 2016, the Videos had been posted anonymously on the website "4chan." *See* Mayer Decl. ¶18, Ex. S. By 2019, the Videos appeared on more than a dozen other websites, which have no affiliation with Appellees. *See id.*, Andreou Decl. ¶¶6-7, Ex. A; Order at 4.

When the Uploaders uploaded the Videos to Pornhub, the Uploaders selected and/or created the categories, tags, and titles for the Videos without input from

---

[7] Hammy does not know the identity of the user "cwdistribution." Haladjian Decl. ¶23. At the time the cwdistribution account was created, it was possible for users to upload videos without first going through an identity verification process. *Id.* ¶22. Hammy has since changed its systems so that uploads are accepted only from accounts which have gone through an identity verification process, which includes providing a copy of a government-issued identification. *Id.* ¶24.

MindGeek. *See* Ignatiou Decl. ¶40. A moderator changed the categories for two of the Videos. Supplemental Declaration of Andreas Ignatiou (ECF 578-2, "Ignatiou Suppl. Decl.") ¶¶19-24. When the Videos were uploaded to xHamster, in accordance with Hammy's protocol in 2019, "cwdistribution" would have created the title and description for the Videos and selected one or more categories from a pre-set list. Hammy. Tr. 95:4-7; Int. Ans. at 5. Tags would have been suggested by xHamster's automatic tagging system based on the user's description, title, and categories of the Video, and only the user could have selected the tags. Int. Ans. at 5. Hammy would not have changed the Videos' titles, descriptions, categories or tags. Hammy Tr. 148:21-149:11.

The Uploaders' tags and titles on Pornhub did not contain any words on MindGeek's "banned words" list in 2019. Ignatiou Decl. ¶41. Nor any that were inherently unlawful or indicative of illegal content. *Id.*, Ex. B. In fact, adult entertainment studios commonly produced fake "voyeur" content, including content featuring professional, consenting adults pretending to be "caught" by a "hidden camera" in a private location. *Id.* ¶24.

### E. **<u>Appellees Receive Notice, Promptly Remove the Videos, and Cooperate With Authorities.</u>**

On October 17, 2019, MindGeek received a search warrant from the Gaffney Police Department regarding the six Videos uploaded by cwdistribution. Mayer Ex. U. The same day, MindGeek took down the identified Videos from Pornhub and

removed cwdistribution's account. *See* Ignatiou Decl. ¶¶44-45, Ex. B. On October 21, 2019, MindGeek received another search warrant, this time regarding the two Videos uploaded by LordFauger18. *See* Mayer Ex. V. The next day, MindGeek removed both Videos and LordFauger18's account. *See* Ignatiou Decl. ¶¶44-45, Ex. B. Appellants do not claim—nor have they proffered evidence—that any of the Videos appeared on Pornhub (or any other MindGeek website) any time thereafter.

In November of 2019, Hammy was contacted by the Gaffney Police Department and informed that a user had uploaded Videos to xHamster. Haladjian Decl. ¶17 and Exhibit 1 thereto; Hammy Tr. 119:11-22. This was the first Hammy became aware of the Videos and their non-consensual nature. Haladjian Decl. ¶20. The Gaffney Police requested information about the Videos' uploader, and Hammy immediately provided all the information it possessed. *Id.* ¶18. The Gaffney Police requested that Hammy provide access to the Videos so they could be downloaded for evidence and that the Videos subsequently be taken down. Hammy complied. *Id.* ¶19.

## II. PROCEDURAL HISTORY

The nearly six-year history of this case has provided Appellants with countless opportunities to be heard on six amendments to their pleading and a lengthy period to conduct discovery, 29 depositions and tens of thousands of pages of produced

discovery. Despite Appellants' protestations to the contrary, the record and legal issues in this case were well-developed and well-understood by the district court.

### A. **The First Five Complaints.**

Appellants' initial Complaint in this lawsuit was filed on March 4, 2020. *See* ECF 1. Appellants filed an Amended Complaint shortly thereafter. *See* ECF 5. After meeting and conferring with Defendants regarding the proper parties, Appellants filed a Second Amended Complaint on July 16, 2020. *See* ECF 33. On September 14, 2020, MindGeek filed its Motion to Dismiss the Second Amended Complaint. *See* ECF 46. Hammy was never served with any of the first three complaints.

On October 4, 2020, Appellants filed a short, *pro forma* Motion for Leave to file a Third Amended Complaint. *See* ECF 50. The Third Amended Complaint (and fourth Complaint overall) was substantively identical to the first three versions, and did not add any new factual allegations. The only substantive difference was the addition of two causes of action: (1) a Second Cause of Action for "Invasion of Privacy – Wrongful Publicizing of Private Affairs," and (2) a Third Cause of Action for "Invasion of Privacy – Wrongful Appropriation of Personality." See ECF 50-2 at ¶¶70-85. MindGeek opposed the motion for leave, but the District Court granted it. *See* ECF 55, 58. Hammy was never served with the Third Amended Complaint.

On November 17, 2020, MindGeek filed its *second* Motion to Dismiss (the Third Amended Complaint). *See* ECF 64. On December 9, 2020, and before the Court could address MindGeek's second Motion to Dismiss, Appellants filed a *Fourth* Amended Complaint (fifth Complaint overall) with substantively identical allegations but adding yet another cause of action—a civil RICO claim. *See* ECF 79-2. In response, MindGeek filed a third Motion to Dismiss, arguing that the privacy and publicity claims should be dismissed because they were premised on a purported agency relationship between Murphy and MindGeek, and, regardless, all of the claims were barred by Section 230 of the Communications Decency Act. ECF 64.

### B. <u>The District Court's June 16, 2021 Dismissal Order.</u>

In June 2021, the court partially granted MindGeek's motion to dismiss the Fourth Amended Complaint as to Appellants' claims for various Invasion of Privacy Torts as well as Intentional Infliction of Emotional Distress. ECF 133. Appellants' claims for Negligent Monitoring, False Light, Civil Conspiracy, and RICO (on the basis of alleging fraud only) survived the Motion to Dismiss. The district court concluded that Appellants had failed to allege any facts that could support the conclusion that there was an agency relationship between MindGeek and Murphy, such that MindGeek could be liable for Murphy's conduct in creating a surreptitious recording of Appellants. *See* ECF 133 at 6-8.

The district court granted MindGeek's partial motion to dismiss before Hammy had been served with the Fourth Amended Complaint.

### C. <u>Hammy's Motion for Judgment on the Pleadings.</u>

Hammy answered the Fourth Amended Complaint on March 29, 2022 and filed a Motion for Judgment on the Pleadings with respect to the Fourth Amended Complaint on the same date. *See* ECF 173-174. Hammy's motion for judgment on the pleadings was never ruled on and was mooted by the Appellants' filing of the Fifth Amended Complaint.

### D. <u>The Fifth Amended Complaint.</u>

On June 3, 2022, nearly a year after the District Court's Dismissal Order, Appellants filed a Fifth Amended Complaint (*i.e.*, a sixth Complaint overall). It added ***eleven*** new Defendants, dozens of new substantive allegations about MindGeek's and xHamster's purported business models, and a brand-new claim for violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA") that dramatically changed Appellants' case theory. ECF 193.

The Fifth Amended Complaint did not contain any allegations aimed at correcting the factual and legal deficit identified by the district court regarding Appellants' effort to impute liability for their invasion of privacy claim to the Appellees for Murphy's conduct under an "agency" (or any other) theory. Nor did the Fifth Amended Complaint state a cause of action against Hammy for invasion of

privacy. To the contrary, the Fifth Amended Complaint made clear that the Third, Fourth, and Fifth Claims for Relief for various Invasion of Privacy torts were alleged against Murphy alone (indeed, the title of those claims stated "AGAINST DEFENDANT MURPHY"). ECF 193 at ¶¶133-157.

The Fifth Amended Complaint asserted the following claims against Appellees: (1) "violation of the [TVPRA];" (2) "conducting the affairs of an enterprise through a pattern of racketeering activity" in violation of RICO; (3) "negligent monitoring," (4) "false light;"; and (5) "civil conspiracy." ECF 193 at ¶¶ 95-132, 180-197. On August 9, 2022, the IUP Doe filed the operative Third Amended Complaint (IUP Dkt. 91) with the same claims.

### E. The District Court Grants Summary Judgment.

Appellees moved for summary judgment on January 10, 2025. ECF 475, 477, 478, 479. On February 10, 2025, Appellants filed their Responses in Opposition. ECF Nos. 488, 489, 492, 493. The court held a lengthy hearing on June 18, 2025. ECF No. 593. On September 3, 2025, the district court issued a detailed, 77-page order granting Appellees' motions. ECF 635 (the "Order"). The court held that Appellees were entitled to immunity under CDA Section 230. The court addressed, and rejected, each of Appellants' arguments for why Appellees were not entitled to Section 230 immunity.

***First***, the district court considered Appellants' claim that Appellees should be

considered information content providers, outside the protection of Section 230, because they materially contributed to the content at issue. Order at 35. The court recognized that "a party becomes an information content provider when it directly and materially contributed to what made the content itself unlawful." *Id*. at 36, quoting *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 127 (4th Cir. 2022) (internal quotation marks omitted). The court held that Appellees performed the same content neutral steps on all videos on their websites, did not contribute to the unlawfulness of the videos at issue, and simply provided a platform through which third parties uploaded videos. *Id*. at 38. The court made clear that "the illegal nature of the Videos here was that they were recorded without the consent of [Appellants] and that, to show that Defendants materially contributed to the content, there must be evidence that Defendants materially contributed to the recording of these Videos without [Appellants'] consent." *Id*. at 46.

***Second***, the district court found that Appellants' claims sought to hold Appellees responsible as the publisher of third-party content because the selection and editing of content for a website is "the quintessential function of a 'publisher' under Section 230." *Id*. at 52 (citation omitted). The court concluded that Appellants' claims were barred by Section 230 because: "(1) MindGeek and Hammy are both undisputedly an interactive computer service; (2) third-party Uploaders provided the Videos to MindGeek and Hammy and … neither MindGeek nor

Hammy have materially contributed to their illegality to make them an information content provider as to these Videos; and (3) [Appellants'] claims, particularly their tort law claims, treat MindGeek and Hammy as a publisher." *Id*. at 53.

***Third***, the district court rejected Appellants' argument that the Fight Online Sex Trafficking Act ("FOSTA") exception to Section 230 applied because Appellees were liable as beneficiaries of a sex trafficking venture under the TVPRA. *Id*. at 53-61. The court concluded "there is no evidence that Appellants were trafficked within the meaning of § 1591 of the TVPRA." *Id*. at 56. The court reasoned that "[Appellants] were not 'acquired' or brought under the control of Murphy or anyone else" and explained that Section 1591 applies to the trafficking of people, not videos. *Id*. at 58. Furthermore, there could be no beneficiary liability for Appellees because they had no relationship with Murphy, nor was there any relationship between Murphy and the individuals who uploaded the Videos. *Id*. at 59-61. Consequently, the FOSTA exception to Section 230 and Appellants' TVPRA claim both failed.

***Fourth***, the district court rejected Appellants' claim that their civil conspiracy claim against Appellees was based on their agreements to share revenue with the uploaders of the Videos because it was different than the civil conspiracy alleged in Appellants' Fifth Amended Complaint, which was only among Defendants. *Id*. at 62-63. Furthermore, Appellants' civil conspiracy claim against MindGeek failed as a matter of law because there was no agreement between two or more persons, as

required. *Id*. at 62. As for Hammy, Appellants had failed to prove there was an agreement to commit unlawful acts based on its business agreements with co-Defendants Wisebits and TrafficStars. *Id*. at 64.

***Fifth and finally***, the district court rejected Appellants' allegation that Appellees were subject to liability because they republished the Videos on the Websites after they were initially taken down. *Id*. at 64-68. The court reasoned that Appellants had failed to meet their burden of establishing that the Videos were re-posted because they had not offered any expert testimony establishing what the metadata about the Videos showed. *Id*. at 68.

## SUMMARY OF ARGUMENT

The district court's decision must be affirmed for several reasons:

***First***, Appellants' Opening Brief improperly consists of arguments raised for the first time on appeal. Appellants do not, and cannot, identify any "exceptional circumstances" that would excuse what is otherwise a bedrock limitation on the purview of this Court. There was no "fundamental error" below that would justify Appellants' new counsel's decision to submit an entirely different case on appeal.

***Second***, even if Appellants' arguments had been properly submitted below, their conception of "material contribution" is fundamentally irreconcilable with the line that courts "have consistently drawn… at the crucial distinction between, on the one hand, taking actions (traditional to publishers) that are necessary to the display

of unwelcome and actionable content and, on the other hand, responsibility for what makes the displayed content illegal or actionable." *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1269 n.4 (9th Cir. 2016) (internal quotations omitted). Appellants identify no action by Appellees that crosses that line, and they cite no legal support for their attempts to re-frame traditional publisher functions—such as publishing third-party content and organizing, categorizing or enabling searches of that content—as the required "something more."

***Third*****,** Appellants appeal only one of several claims dismissed by the district court on summary judgment (false light), but dismissal must be affirmed for the independent reason that Appellants failed to properly plead the (foreign) sources of law upon which that claim depends. Because Appellants' false light claim was never properly pled, despite multiple opportunities to do so, that claim cannot survive.

***Fourth and finally*****,** Appellants identify no cognizable reason to reverse the district court's early dismissal of their privacy claims. The court correctly rejected Appellants' threadbare allegations that Appellees had an agency relationship with Murphy, and dismissed Appellants' privacy claims based on those allegations. The record since the dismissal has only confirmed Appellees had nothing to do with Murphy's despicable actions. Appellants' improper new framing of their privacy claims is also unsustainable. Privacy claims premised upon a website's hosting of third-party content run squarely into Section 230 immunity, and Appellants' belated

invocation of the ECPA does not help them. The ECPA plainly does not apply to the Videos, as they were never alleged to be (and plainly are not) intercepted wire communications. Indeed, they have no sound.

## ARGUMENT

### I. STANDARD OF REVIEW

Appellants' proposed standard of review incorrectly ignores the district court's factual findings and mischaracterizes the scope of the court's legal holdings. "Because the [district court below] decided the case on summary judgment motions, [this Court] review[s] its ***legal determinations*** *de novo*[.]" *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359, 362 (4th Cir. 2003) (*citing Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 928 (4th Cir.1995)) (emphasis added). "But since it also engaged in fact-finding to dispose of the matter, we review its ***findings of fact*** for clear error." *Id.* (*citing Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 91–92 (4th Cir.1997)) (emphasis added).

Moreover, to the extent that Appellants' arguments before this Court are based on entirely new legal theories not presented to the district court, this Court limits its review to "fundamental error," defined as the type of error "'so serious and flagrant that it goes to the very integrity' of the proceedings." *Hicks v. Ferreyra*, 965 F.3d 302, 310 (4th Cir. 2020) (quoting *Stewart v. Hall*, 770 F.2d 1267, 1271 (4th Cir. 1985)).

## II. APPELLANTS MAY NOT RAISE NEW THEORIES ON APPEAL

There are few bedrock principles more firmly established within this Circuit than, absent truly "exceptional circumstances," an appellant may not raise new issues for the first time on appeal. *See, e.g., Tarashuk v. Givens*, 53 F.4th 154, 167 (4th Cir. 2022) ("'It is well established that this court does not consider issues raised for the first time on appeal, absent exceptional circumstances'") (quoting *Hicks*, 965 F.3d at 310; *Williams v. Prof'l Transp. Inc.,* 294 F.3d 607, 614 (4th Cir. 2002) (same). "The policies behind the rule are obvious: 'respect for the lower court, [an avoidance of] unfair surprise to the other party, and the need for finality in litigation and conservation of judicial resources.'" *Wheatley v. Wicomico Cty.,* 390 F.3d 328, 335 (4th Cir. 2004) (citation omitted).

To meet the "exceptional circumstances" requirement, an appellant must demonstrate "fundamental error" "so serious and flagrant that it goes to the very integrity of the proceedings." *Hicks*, 965 F.3d at 310. "This rigorous standard is an even higher bar than the 'plain error' standard applied in criminal cases." *Id.* "[T]he burden is on the party who has failed to preserve an argument to show that [this] standard is met." *Tarashuk,* 53 F.4th at 167.

Moreover, when raising an argument for the first time on appeal, the appellant's failure to address and argue that they meet the fundamental error standard is a sufficient reason to affirm the lower court's decision. *Id.* ("Here, Appellants

have not pointed to any 'exceptional circumstances' necessitating our review of this issue for the first time, and there is nothing in the record that demonstrates 'a reason sufficient to clear this "high[] bar."'… Appellants have also not addressed our 'fundamental error' standard, nor have they attempted to show that they can meet it here. For that reason alone, Appellants have not satisfied their burden of identifying a 'fundamental error' warranting reversal on a ground not raised before the district court.") *Chalifoux v. Wetzel Cnty. Hosp., Inc.*, 2025 WL 1879597, at *5 (4th Cir. July 8, 2025) (declining to address newly raised argument where the Appellant "does not point to any exceptional circumstances, nor does he address the fundamental error standard to justify our review.")

As discussed below, Appellants have attempted to introduce new issues on appeal. Strikingly, they do not acknowledge that they are doing so, nor do they address the fundamental error standard. Their new arguments should be rejected for this reason alone.

## III. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT ON APPELLANTS' FALSE LIGHT CLAIMS

### A. <u>The District Court Correctly Applied Section 230, and Appellants Now Raise Very Different Arguments on Appeal.</u>

The District Court correctly held there are three elements required for a defendant to claim immunity under Section 230 of the CDA:

> (1) it is a "'provider or user of an interactive computer service'"; (2) the plaintiff's claims hold it "responsible 'as the publisher or speaker of

> any information'"; and (3) the relevant information was "'provided by another information content provider.'"

Order at 33 (citation omitted).

The Appellants did not directly contest any of these three factors below, but instead argued that Section 230 should not apply to Appellees because: (1) they allegedly materially contributed to the Videos such that they should be considered an "information content provider" rather than merely an "interactive computer service"; (2) the exception for claims arising under the TVPRA should apply; and (3) their civil conspiracy claim did not treat MindGeek or Hammy as a publisher, so Section 230 should not apply. Appellants have not appealed the District Court's ruling on the TVPRA or their civil conspiracy argument.

As for material contribution, Appellants argued below that Defendants materially contributed in the following ways: creating thumbnails from the Videos; creating tags for the Videos; removing and/or adding categories to the Videos; providing a written "playbook" to uploaders; creating rules for advertisement placement that affected what advertisements appeared alongside the Videos; and using non-neutral algorithms to direct traffic to the Videos.[8]

---

[8] Some of Appellants' allegations related only to MindGeek and some related to all of the Appellees. The District Court properly found that none of the alleged acts constituted material contribution.

After careful consideration and a detailed canvassing of the case law, the District Court correctly concluded: Appellants had failed to reach the threshold for material contribution; had failed to present evidence of any conduct that went beyond the exercise of traditional publisher functions; and that, in any event, Appellees had not materially contributed to that which made the conduct illegal in the first place. The District Court dedicated 18 pages of its opinion (Order at 35-52) to a detailed analysis of Appellants' various arguments concerning "material contribution." The court correctly concluded that none of the actions taken by Appellees contributed to "the illegal nature of the Videos" which "was that they were recorded without the consent of [Appellants.]" Order at 46.

Unable to argue that the District Court's reasoning was incorrect or inconsistent with existing case law, Appellants instead proffer a new theory of the case to argue that the District Court misunderstood that which made the underlying content illegal. Before the district court, Appellants argued that it was the surreptitious and nonconsensual nature of the Videos that constituted the relevant "illegal act." In support of their arguments below, Appellants (and their expert witnesses) consistently maintained that any reasonable person would be able to tell simply by looking at the Videos that they were recorded without the Appellants' consent. *See, e.g.,* ECF 488 at 8; *Id.* at 42; ECF 492 at 33-34; Deposition of Plaintiff's Expert Scott Brandon (ECF 492-23, "Brandon Tr."). 162:19-22; *Id.*

168:11-13; *Id*. 314:20-315:1; Preliminary Expert Report of W. Scott Brandon (ECF 492-5) at 26.

Before this Court, however, Appellants contend that the district court "misunderstood what that illegality was here. The illegality that the [Appellants] challenge is not the unlawful *filming* of the videos, as the court thought." Appellants' Brief ("App. Br.") at 3. In other words, the illegality was not that which Appellants had consistently argued it was before the district court, but instead "it is the way in which the videos were *presented*, which falsely suggested to some that the girls were amateur porn actors." *Id.* Appellants now argue—in direct contradiction of their earlier arguments—that viewers of the Videos might have been misled into believing that the Videos were consensual. Unsurprisingly, since this was not a theory developed below in discovery or presented to the district court, there is no evidence in support of it, and nothing in the record. Appellants are left to speculate in their Opening Brief that "some viewers likely thought" the Videos were consensual. *Id*. 18. And yet, Appellants contradict even their own weak speculation, also arguing that the Videos "contained several telltale signs that they were recorded without the [Appellants'] knowledge or consent" (*id.* at 25) and "had all the hallmarks of unlawfully recorded hidden-camera videos." *Id.* p. 60.

Appellants do not acknowledge that they have changed their theory of material contribution on appeal, and they fail to point to any exceptional

circumstances or fundamental error that would justify this Court considering their new theory. *Hicks*, 965 F.3d at 310.

### B. Appellants' New Material Contribution Arguments Are Contradicted By Well-Established Precedent.

Even if properly before this Court, Appellants' new material contribution argument fails. Of the three conditions required for Section 230 immunity, Appellants challenge only the second condition: the content must have been provided by another "information content provider." Appellants claim Appellees are information content providers for the Videos because they "materially contributed to what made the content [at issue in this case itself] unlawful." *See* App. Br. at 40 (citing *Henderson*, 53 F.4th at 128). Appellants argue that Appellees materially contributed (1) by allowing the Videos to be published by a third party to an adult content website; and (2) by allowing other adult content and advertising, as well as organizational category titles, to appear alongside the Videos. Each of Appellants' theories of material contribution is unworkable and unprecedented.

#### 1. The Decision "Whether To Publish" Cannot Constitute "Material Contribution" According To Precedent.

This is the quintessential case to which Congress intended to extend Section 230 protection. Appellees did nothing more than allow content created by Murphy and uploaded by third parties to be posted on their Websites, before removing it as soon as it was brought to their attention. Protecting websites' freedom to allow

posting of third-party content is the *raison d'etre* for Section 230. This Court has well-explained the statute's motivating policy:

> The amount of information communicated via interactive computer services [i.e., internet websites and platforms] is … staggering. The specter of tort liability in an area of such prolific speech would have an obvious chilling effect. It would be impossible for service providers to screen each of their millions of postings for possible problems. Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted. Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect.

*Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997). Consistent with that purpose, a website's decision "whether to publish, edit, or withdraw the posting" is the central "publisher role … for which § 230 specifically proscribes liability[.]" *Id.* at 332-33; *see also Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) ("Recognizing that the Internet provided a valuable and increasingly utilized source of information for citizens, Congress carved out a sphere of immunity from state lawsuits for providers of interactive computer services to preserve the 'vibrant and competitive free market' of ideas on the Internet." (quoting 47 U.S.C. § 230(b)(2)); *J.R. v. Mancino,* 2024 WL 3048368, at *1, 3 (D.S.C. May 31, 2024) (similar, dismissing TVPRA, negligence, invasion of privacy, and civil conspiracy claims), *report and recommendation adopted*, 2024 WL 3047553 (D.S.C. June 18, 2024).

Knowing that Congress has provided Appellees with immunity for the simple decision of "whether to publish, edit, or withdraw [a third party's] posting," Appellants attempt to reframe Appellees' actions as something more. They contend that, by simply allowing the Videos to be uploaded to ***an adult content website***, Appellees *ipso facto* "presented the plaintiffs as amateur actors" who "consented to being filmed or to appearing on a porn site" and "insinuated … the plaintiffs were the kind of people willing to be shown naked on a porn website." App. Br. at 39, 42 (cleaned up). But Appellants do not, and cannot, identify any legal authority for the novel theory that simply hosting third-party content on a particular genre of website constitutes an actionably false insinuation, such that the website's decision "whether to publish" constitutes a "material contribution." Such a holding would eviscerate the line that courts "have consistently drawn… at the crucial distinction between, on the one hand, taking actions (traditional to publishers) that are necessary to the display of unwelcome and actionable content and, on the other hand, responsibility for what makes the displayed content illegal or actionable[.]" *Kimzey*, 836 F.3d at 1269 n.4 (internal quotations omitted).

Appellants' unprecedented theory—that the mere nature, focus, or theme of the website to which a third party publishes content may, by itself, materially contribute to the actionability of that content—turns Section 230 on its head. Merely permitting preexisting content to be posted on a website (even one dedicated to adult

content) cannot alone take that website outside the protection of Section 230. Indeed, much of this Court's own bedrock Section 230 precedent also involved posting content to websites dedicated to certain topics that could arguably "insinuate" something about the postee by virtue of their inclusion.

In *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, this Court gave Section 230 immunity to Consumeraffairs.com, which allegedly solicited and structured its website to develop consumer complaints as well as "entice[] visitors with the possibility of participating in a class-action lawsuit, with the potential for a monetary recovery[.]" 591 F.3d 250, 256-262 (4th Cir. 2009) (Jones, J., concurring). Appellants would have had this Court withdraw immunity because merely including a particular business among complaints on a website dedicated to identifying bad business practices ***itself*** arguably could constitute a defamatory or false statement. Instead, the Court held that "there is nothing unlawful about [Consumeraffairs.com] developing this type of content" in and of itself because class-actions are undoubtedly "legal undertaking[s.]" *Id.* at 257. So too is pornography. The *Nemet* Court engaged in the same analysis the district court correctly undertook below—asking whether the website materially contributed to the unlawful nature of the posted content ***itself***—not whether the website made an unlawful statement simply by deciding "whether to publish, edit, or withdraw" that content.

In *Jones v. Dirty World Ent. Recordings LLC* (relied upon in this Court's

*Henderson* opinion), the Sixth Circuit extended Section 230 immunity to an online tabloid called "thedirty.com" because the allegedly defamatory content at issue—photographs of plaintiff and statements that she had "slept with … [multiple] [f]ootball player[s]" and contracted multiple STDs—had been authored by a third party. 755 F.3d 398, 403 (6th Cir. 2014). Again, Appellants would have immunity withdrawn on the theory that the mere decision to publish third-party statements on a gossip website called "the dirty" itself constitutes a defamatory statement. But as in *Nemet,* the Sixth Circuit instead looked at the degree to which thedirty.com contributed to ***authoring the specific defamatory statement***. The court concluded that Section 230 applied where defendants "did not author the statements at issue[,]" but rather "select[ed] the statements for publication" and added editorial comments that appeared next to the allegedly defamatory statements. *Id.* at 415.

This Court's *Henderson* decision is consistent. There, the Court considered a company that "acquire[d] public records, such as criminal and civil records, voting records, driving information, and professional licensing … from various local, state, and federal authorities" and then used the collected information to create reports that it published to a website database (Publicdata.com). *Henderson*, 53 F.4th at 117. To create those reports, Publicdata.com authored substantial "summaries" of some public records and included "re-formatted" and "altered" excerpts of other records. *Id.* at 117-118. This Court concluded that PublicData.com's "own actions

contributed in a material way to what made the content at issue" subject to liability because "the report Public Data sent to [plaintiff's] potential employer" ***was largely written by PublicData.com***, and included inaccurate and misleading assertions about the plaintiff. *Id.* at 128. Here, by contrast, it is undisputed that Appellees were not involved in any way with creating the Videos, nor is there any allegation that the Videos themselves were altered or edited by Appellees.[9] The *Henderson* court confirmed that "material contribution" entails going "beyond the exercise of traditional editorial functions[,]" 53 F.4th at 128, such as the decision whether or not to publish, as well as formatting or procedural alterations to the content, *id.* at 129. The relevant benchmark is whether a website crosses "the line into ***substantively altering the content at issue*** in ways that make it unlawful." *Id.* (emphasis added). Appellants do not, and cannot, identify any substantive alteration to the Videos here.

Indeed, multiple federal courts have held that Section 230 precluded liability for false light invasion of privacy on theories akin to that now advanced by Appellants. *See, e.g., Morton v. Twitter, Inc.*, 2021 WL 1181753 (C.D. Cal. Feb. 19, 2021) (dismissing plaintiff's false light claim that third party's posting of nude

[9] Appellants argued below that the automatic generation of thumbnails when the Videos were posted by third-party uploaders, constituted the ***creation*** of unlawful content. The district court rejected that argument. Order at 38-41. On appeal, Appellants include reference to their thumbnail allegations in the background section of their Opening Brief, but make no argument as to the legal significance of the thumbnails or why the district court's holdings were wrong. The issue is thus waived.

photographs of her on Twitter might lead viewers to believe she was voluntarily participating in pornography); *Asia Econ. Inst. v. Xcentric Ventures LLC*, 2011 WL 2469822, at *6 (C.D. Cal. May 4, 2011) (dismissing plaintiff's false light claim, where website's coding increased "the prominence of a page in internet searches"); *Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288, 292 (D.N.H. 2008) (dismissing plaintiff's false light claim after third party created fake explicit dating profile where plaintiff alleged that website caused the fake profile to appear as "teasers" on internet search engines and as advertisements on "sexually related" websites).

In sum, Appellants do not identify any authority that a website's mere decision to publish content on a particular type of website materially contributes to the alleged unlawfulness of that content. Appellants suggest that ***a different rule*** should apply in the case of adult content websites, given their pornographic nature. App. Br. At 43-44. But this approach, too, is unsupportable. A plethora of decisions have applied Section 230 to websites featuring adult content. *See, e.g., Doe v. Webgroup Czech Republic, A.S., et al.*, 2024 WL 3533426 (C.D. Cal. July 24, 2024); *Doe v. Reddit, Inc.,* 2021 WL 5860904 (C.D. Cal. Oct. 7, 2021), *aff'd in part, rev'd in part,* 51 F.4th 1137 (9th Cir. 2022). Pornographic content depicting consenting adults is legal in the United States and entitled to First Amendment protection. *See, e.g., Sable Commc'ns of California, Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989). The district

court correctly concluded that what makes the Videos in this case illegal and/or actionable is ultimately the lack of consent. Section 230 squarely proscribes Appellants' novel theory that Appellees' mere hosting of the Videos contributed to their illegality.

#### 2. The Appearance Of Other Adult Content, Advertisements, And Category Titles Alongside The Videos Does Not Constitute Material Contribution.

Appellants next argue that Appellees materially contributed to the Videos' illegality because, by employing neutral organizational tools such as categories and by placing the Videos next to other adult content and advertisements, Appellees created an actionably false "context" surrounding the Videos. App. Br. at 43-44. Appellants claim that the guiding analysis is whether the "context" created by a website's organizational tools changes or amplifies the content's "'effect' on viewers." App. Br. at 44. Appellants cite no Section 230 authority for that proposition, nor explain how such an amorphous and subjective test would work in practice. Notably, Appellants' proposed approach resembles the "ratifies and adopts" test the Sixth Circuit declined to adopt in *Jones.* There, the district court proposed that when a website has added text or commentary that appears adjacent "to third-party content that 'ratifies or adopts' that content, then the provider becomes a 'creator' or 'developer' of that content[.]" *Jones*, 755 F.3d at 415. The Sixth Circuit firmly rejected that approach, reasoning that it "abuses the concept of responsibility. A website operator cannot be responsible for what makes another

party's statement actionable by commenting on that statement post hoc." *Id.* That aspect of the *Jones* opinion was later adopted and restated by this Court in *Henderson*, 53 F.4th at 128.

This Court need not grapple with the precise meaning of Appellants' suggested analysis because this Court (and others) have already adopted a substantially more concrete approach. Just as it is well-settled that Section 230 protects the decision "whether to publish," it also protects "taking actions (traditional to publishers) that are necessary to the display of [even] unwelcome and actionable content." *Jones*, 755 F.3d at 414. To determine when a publisher tool crosses the line into material contribution, courts look for "something more" than "merely taking action that is necessary to the display of allegedly illegal content[.]" *Id.* at 410. Courts ask whether some significant and ***"substantive"*** alteration was made ***to the content itself*** that contributes to what made the content illegal. *Henderson*, 53 F.4th at 129. Even some level of "editing" and added commentary (which did not occur here) is insufficient. *See Jones*, 755 F.3d at 415-416. Providing "neutral tools" to aid in the display or organization of, or search for, content also does not rise to the level of material contribution. *See id.*, 755 F.3d at 410-411; *see also Doe v. WebGroup Czech. Republic*, 2026 WL 2334146, at *1 (9th Cir. Aug. 12, 2026) ("'[A] website helps to develop unlawful content . . . if it contributes materially to the alleged illegality of the conduct.' ...By contrast, 'providing neutral tools as to

the alleged unlawfulness does not amount to development.' …WebGroup's sites offer neutral tools such as tags, keywords, search functions, recommendation algorithms, thumbnails, revenue-sharing schemes, VPN use, and anonymized communication. These tools do not contribute materially to the illegality of child sex abuse material or treat such content 'differently than any other third-party created content, and thus are entitled to § 230 immunity.'"); *see also Ripple Labs Inc. v. YouTube LLC*, 2020 WL 6822891, at *6 (N.D. Cal. Nov. 20, 2020) (rejecting theory that "YouTube materially contributed to the … content… by awarding a 'verification badge' ... thereby 'communicating to hundreds of thousands of viewers and subscribers that these hacked accounts and channels were "the official channel of a creator, artist, company, or public figure." ... The badge did not materially contribute to the content's illegality here."); *Gaughan v. Barounis*, 2025 N.Y. Misc. LEXIS 17243, at *24 (N.Y. Dec. 18, 2025) (applying Section 230 immunity to adult content website notwithstanding argument the website "was responsible for defamation based the labels [it] assigned to plaintiff's profile").

Appellants attempt to resist these precedents by suggesting that "[i]t makes no difference whether the porn companies took certain actions with respect to 'all videos' on the site." App. Br. at 50 (citing *Henderson*). However, this Court's opinion in *Henderson* did not examine how to apply the material contribution test to neutral publisher organizational and posting tools, such as placing advertisements

alongside content, organizing them with category and tag functions, or providing captions. As discussed *supra*, *Henderson* examined a website's extensive and "substantive" ***direct authoring*** of allegedly defamatory content. It is undisputed that Appellees did not "author" the Videos.

Applying fundamental Section 230 principles, the district court correctly concluded that, for the Videos, "MindGeek and Hammy applied the same, content-neutral publishing functions that it did to all other videos uploaded to its website, and [Appellants] have presented nothing more than a scintilla of evidence, if any evidence at all, that MindGeek or Hammy did so in a way that ***contributed to the content displayed in the Videos***." Order at 46 (emphasis added). The record supports this conclusion. There is no evidence that Appellees altered or contributed to the Videos themselves, let alone ***substantively*** altered them. And the placement of other adult content—including advertisements consistent with that genre—around the Videos is neutrally endemic to placing ***any*** content on an adult website. As the district court cogently noted, "it is undisputed that advertisements appear around all videos present on MindGeek and Hammy's websites." *Id.* at 48-49.

The categories, which appeared alongside the Videos, were also neutrally applied and purely organizational. They were taken from pre-set, static lists applied to all videos on the Websites—*i.e.*, none was specifically created as commentary for the Videos. *Id.* at 41-47. The categories were merely the digital equivalent of sorting

books onto shelves at the library (*e.g.*, fantasy, scifi) in a way that best enables the consumer to find them. That this case involves adult content websites, and that the category labels reflect the nature of that content, does not change the analysis.

MindGeek's moderators' adjustment of categories for two of the eight Videos also does not change the result. The added categories—"Amateur," "Fetish" and "Lesbian"—are commonplace organizational labels drawn from the same pre-set list applied to all content on Pornhub.[10]

Ultimately, third parties posted content to the Websites that they held out as consensual pornography. Appellees thereafter used neutral tools that treated the content as such, including sorting it into commonplace adult categories. And even assuming *arguendo* that such neutral organizational tools were to constitute commentary, it would not rise to the level of a material contribution. *See Jones*, 755 F.3d at 415 ("A website operator cannot be responsible for what makes another party's statement actionable by commenting on that statement post hoc").

The district court correctly concluded that "even if Mindgeek and Hammy [had] selected all the categories and tags" for the Videos at issue, the selection of categories and tags in and of itself would not be sufficient to withdraw Section 230

[10] The "Lesbian" category was for content that depicted only women, so it could be easily found by viewers who, perhaps because of their own sexual orientation, may not wish to see adult content featuring men. The category did not denote content necessarily depicting same-sex activity. ECF 578-2 (Ignatiou Suppl. Decl. ¶24).

immunity. The precedents of this and other Circuits support the district court's holding, and have conferred Section 230 immunity in cases where websites undertook far more substantive and editorial actions. *See, e.g., Jones*, 755 F.3d 398 (website directly edited allegedly defamatory content and added distasteful commentary that appeared alongside it), *Nemet*, 591 F.3d 250 (website not only "steered" allegedly defamatory content to be posted into "specific categor[ies] designed to attract attention by consumer class action lawyers," but also contacted the third parties to ask "questions about" their complaints and help them "draft or revise" their complaints[.]").

By contrast, in the Section 230 cases relied on by Appellants (App. Br. at 44-45), the websites did not receive protection because they went beyond the role of a traditional publisher or the plaintiffs were not seeking to hold the websites liable as publishers. *Compare Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC,* 521 F.3d 1157, 1169–70 (9th Cir. 2008) (website designed and operated the discriminatory search and email systems in such a way that it was inevitable that postings would violate the Fair Housing Act); *Doe v. Internet Brands*, 824 F.3d 846, 853 (9th Cir. 2016) (plaintiff alleged "actual knowledge by Internet Brands from an outside source of information about criminal activity"); *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1106, 1109 (9th Cir. 2009) (plaintiff's claim for promissory estoppel would not be barred by Section 230 because that theory "does

not seek to hold Yahoo liable as a publisher or speaker of third-party content….”); *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019) (the CDA did not apply to Santa Monica's short-term rental ordinance because it did not require online platforms to monitor third-party content and thus did not treat the platforms as a publishers).

### 3. An Inapposite Line of Magazine Cases Does Not Provide Support For Appellants' Unworkable Theories.

Appellants attempt to analogize to a series of pre-Internet cases where the publishers of "sex-centered magazine[s]" were held liable for publishing nude or scantily clad photographs of women without their consent. Those cases stand for the proposition that traditional publishers could be liable for false light invasion of privacy for wrongly suggesting that a person voluntarily appeared in a risqué publication. *See Wood v. Hustler Mag., Inc.*, 736 F.2d 1084, 1086 (5th Cir. 1984) (affirming false light claim where neighbor stole picture of plaintiff and submitted it to Hustler magazine); *Braun v. Flynt*, 726 F.2d 245, 254 (5th Cir. 1984) (concluding plaintiff had a claim for false light where photograph of amusement park worker in her bathing suit was placed in lewd men's magazine following its acquisition under false premise); *Douglass v. Hustler Mag., Inc.*, 769 F.2d 1128, 1138 (7th Cir. 1985) (plaintiff actress had a claim for false light invasion of privacy where Hustler published nude photographs of plaintiff without her permission).

These magazine cases cannot be extrapolated to the online context because

Section 230 specifically governs liability for online companies' exercise of traditional publisher functions.[11] *See, e.g., Zeran*, 129 F.3d at 330. The difference is critical and driven by the underlying purpose of Section 230. Unlike magazines, which can control their radically smaller amount of content per issue, websites cannot realistically exercise control over the huge volume of (third-party) content they routinely host. Congress thus made the specific and targeted policy decision to treat online publishers differently than traditional print publishers. *Id.* at 331. Thus, magazine publishers' liability cannot be equated with websites' liability.

**C. <u>Appellants Failed To Properly Plead Their False Light Claims.</u>**

Appellants' bid to resurrect their false light claims in this case must fail for the independent reason that their claims concededly depend upon foreign (*i.e.,* not South Carolina) law, but Appellants repeatedly failed to properly plead the application of a foreign jurisdiction's law before the District Court below. Pursuant to both S.C. R. Civ. P. 44(d) and S.C. Code Ann. § 19-3-120 (the Uniform Judicial Notice of Foreign Law Act), "[a] party who intends to raise an issue concerning the law of a foreign jurisdiction shall give notice in his pleadings or by other reasonable written notice or applicable motion." S.C. R. Civ. P. 44(d); *see also* S.C. Code

[11] Appellants cite *Pinder v. 4716 Inc.*, 494 F. Supp. 3d 618 (D. Ariz. 2020) (App. Br. at 41-42), which is a case involving online content, but it is not a Section 230 case. Rather, the Appellants in that case alleged that the defendant used photographs of them in advertisements for its strip club, falsely suggesting that Appellants were affiliated with the strip club. *Id.* at 628-29.

Ann. § 19-3-120 ("Every court of this State shall take judicial notice of the common law and statutes of every state, territory and other jurisdiction of the United States when such common law or statutes shall have been put in issue by the pleadings"). Having failed to plead application of foreign law at the proper time, Appellants could not later purport to sustain a claim under foreign law, as Appellants belatedly attempted to do before the District Court (for the first time on summary judgment).[12] *See Marsh v. Hancock*, 342 S.E.2d 607, 609 (S.C. 1986); *Stevenson v. Emerson Elec. Corp.*, 333 S.E.2d 355, 357 (S.C. Ct. App. 1985); *Russell Willis, Inc. v. Page*, 48 S.E.2d 627, 632 (S.C. 1948). The District Court's dismissal of this claim at the summary judgment stage should be affirmed on this basis.

## IV. THE DISTRICT COURT PROPERLY DISMISSED APPELLANTS' PRIVACY CLAIMS.

As an alternative ground for reversal Appellants argue the Court improperly granted MindGeek's Motion to Dismiss the Claims in their Fourth Amended Complaint for "Wrongful Intrusion Upon Private Affairs"[13] (the First Cause of Action) and "Wrongful Publicizing of Private Affairs" (the Second Cause of Action)

---

[12] *See Wheatley*, 390 F.3d at 335 ("[T]here is a thin line between an alternative argument and a last-minute switch in strategy which risks severely prejudicing an opponent and surprising the district court.")

[13] The District Court allowed MindGeek's motion to dismiss the privacy claims from the Fourth Amended Complaint on June 16, 2021 (ECF 133), before the Hammy Defendants had been served in the case. The Hammy Defendants were served on September 29, 2021 and filed an answer to the Fourth Amended Complaint on March 29, 2022 (ECF 173). The Appellants moved for leave to file a Fifth Amended Complaint, which the District Court allowed. The Fifth

by "requir[ing]" that MindGeek had "been involved in the videos' filming."[14] Appellants' newly manufactured argument, which is raised for the first time in their appellate brief is meritless on its face and inconsistent with Appellants' ***own*** factual allegations and legal theories.

### A. The Court Correctly Rejected Appellants' "Agency" Theory.

Contrary to Appellants' claim, they never alleged that MindGeek and Hammy were liable for invasion of privacy because they "***wrongfully disseminated*** a video showing them naked and changing clothes without their permission." (App. Br. at 51; emphasis added). Rather, Appellants explicitly and unambiguously premised both their First and Second Causes of Action on the conduct of Defendant ***Murphy***—specifically, his surreptitious videotaping of Appellants in 2012. Appellants alleged that the basis of their invasion of privacy claim was that "Defendant Pornhub and

---

Amended Complaint did not state a claim against the Hammy Defendants for the privacy claims. (ECF 193). Because there was no order dismissing the Fourth Amended Complaint's privacy claims with respect to the Hammy Defendants—but Appellants nonetheless dropped that count with respect to the Hammy Defendants in the Fifth Amended Complaint, there is nothing for Appellants to appeal with respect to the Hammy Defendants concerning the privacy claims. Appellants attempt to elide this fact in their Opening Brief by generally referring collectively to the "Defendants" in the wrongful disclosure sections of their brief (App. Br. at 52-61).

[14] Appellants did not include a cause of action against MindGeek and Hammy Media for "wrongful disclosure of private facts" in any of their six complaints. Rather, the Fourth Amended Complaint included a First Cause of Action for "Invasion of Privacy - Wrongful Intrusion Upon Private Affairs" and a Second Cause of Action for "Wrongful Publicizing of Private Affairs." It is unclear which of these are the focus of Appellants' appeal.

Defendant xHamster normalized the invasion of privacy ***conducted by their agent Defendant Murphy***…." ECF 99 ("4AC") ¶ 57 (emphasis added). Appellants' First Cause of Action pled:

> 61. Defendant ***Murphy*** … was given access to and/or control over the locker room facilities at Limestone.
>
> 62. Utilizing that access, Defendant ***Murphy placed a hidden video camera*** in Defendant Limestone's locker room and captured video and images of the [Appellants,] their teammates, and other student athletes from around the nation, all while they were fully nude, or in various states of undress.
>
> 63. ***The secret and unauthorized videotaping by Defendant Murphy*** of the [Appellants] and the other student athletes ***constitutes an intrusion in to [sic] the private affairs of the [Appellants] and the other women***….
>
> 66. The secret and unauthorized videotaping ***by Defendant Murphy*** was motivated by the joint venture partnership between Defendant Murphy and Defendants Pornhub and xHamster respectively.

Appellants' Second Cause of Action was similar:

> 71. The conduct of Defendants in ***secretly videotaping the [Appellants]*** and theother [sic] student athletes while totally nude, or in various stages of undress, was done intentionally, and without consent, to Defendants' benefit.
>
> 72. ***The secret and unauthorized videotaping by Defendants of the [Appellants]***… [] and the other student athletes ***constitutes an intrusion in to[sic] the private affairs of the [Appellants]*** and the other women.

*Id.* (emphasis added).

Neither cause of action was premised on "dissemination" of preexisting third-party content, but rather on an unsupportable and implausible legal theory that Defendants conspired with or were in an "agency" or "joint venture" relationship with Murphy. In their Opposition to MindGeek's Motion to Dismiss, Appellants argued, "Plaintiffs have sufficiently alleged a cause of action against all Defendants, including Pornhub, pertaining to the intentional and egregious ***generation*** and dissemination of a nonconsensual illicit video of the Plaintiffs." ECF 114 at 10 (emphasis added).[15] Appellants claimed, "Plaintiffs have properly pled Pornhub conspired with Collins Murphy, for the purposes of mutual financial gain, to generate and disseminate nonconsensual illicit videos[.]" *Id.* at 13.

The district court correctly concluded that Appellants sought "to hold Freesites liable for the acts and misdeeds of Murphy because an agency relationship exists between Freesites and Murphy[.]" ECF 133 at 7. The court rightly rejected that theory, concluding that "[e]ven when reviewing the Complaint in a light most favorable to Plaintiffs, this Court cannot draw a reasonable inference that Freesites had any control over Murphy when he recorded Plaintiffs." *Id*. As the Court found, Appellants never alleged that there was any communication or coordination between

---

[15] Tellingly, Appellants only include part of this quote in their brief, omitting the word "generation." App. Br. at 55. Appellants also include only a few selected excerpts from their Fourth Amended Complaint, placing these excerpts out of context and omitting the core allegations on which the causes of action are based.

Murphy and Defendants, far less that Defendants had any "control" over Murphy—which is the most basic requirement to establish an agency relationship. *See Id.* (citing *Fernander v. Thigpen,* 293 S.E.2d 424, 426 (S.C. 1982) ("The test to determine agency is whether or not the purported principal has the right to control the conduct of his alleged agent."). The court properly held that "even if the financial arrangements between Freesites and Murphy … equaled control (which is implausible), this control occurred several years after the recordings were made…." *Id*. Accordingly, such allegations were insufficient to support invasion of privacy claims. *Id.*; *see Estate of Alvarez by & through Galindo v. Rockefeller Found.,* 96 F.4th 686, 694 (4th Cir. 2024) ("[T]he payment of wages alone is insufficient to establish an agency relationship.").

As the "master[s] of [their] complaint," *U.S. ex rel. Bunk v. Gosselin World Wide Moving, N.V.,* 741 F.3d 390, 406 (4th Cir. 2013), Appellants were responsible for their chosen theories of liability. It was their decision to pursue invasion of privacy claims premised on holding Defendants liable for Murphy's conduct as their purported agent. *See Pueschel v. United States,* 369 F.3d 345, 356 (4th Cir. 2004) ("[I]t was Pueschel's duty, as the master of her complaint, to make sure that the district court identified all of her claims."). Moreover, Appellants could have sought leave to amend their complaint to re-frame their invasion of privacy claims. But rather than assert new or different privacy claims in their multiple amended

complaints, Appellants ***narrowed*** those claims, making clear that they were asserted ***only*** against "Defendant Murphy." *See* 5AC ¶¶133-157.

On appeal, not only have Appellants failed to acknowledge that they are attempting to change their invasion of privacy theory, but they also have failed to point to any exceptional circumstances or fundamental error that would justify this Court considering their new theory. *Hicks*, 965 F.3d at 310. This Court should not consider Appellants' previously unasserted invasion of privacy claims.

### B. Even if Properly Submitted, Appellants' New Privacy Claims Clearly Fall Within Section 230 Immunity.

Even if the Court were to consider Appellants' new invasion of privacy claims, they are barred by Section 230. Appellants' claims are premised on allegations that Appellees "disseminated" or "published" third-party videos, which Murphy created without Appellants' consent and were later uploaded to the Websites. This is precisely the type of traditional publisher activity that is protected by Section 230. *See Zeran,* 129 F.3d at 330 (barring "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions")*; Nemet*, 591 F.3d at 254 (Section 230 bars "holding interactive computer service providers legally responsible for information created and developed by third parties."). Appellants' allegation that Appellees "knew or should have known", as a general matter, that other nonconsensual videos were uploaded to the Websites from time to time (4AC at ¶51), changes nothing. *Zeran,* at 333 ("[l]iability upon

notice would defeat the dual purposes advanced by § 230 of the CDA."); *see also Ben Ezra, Weinstein, & Co. v. America Online Inc.,* 206 F.3d 980, 985–86 (10th Cir. 2000) (upholding immunity for the online provision of stock information even though defendant communicated with the third party); *Poole v. Tumblr, Inc.,* 404 F. Supp. 3d 637, 640 (D. Conn. 2019) (rejecting argument that Section 230 did not apply to defendant's hosting of nude photographs of plaintiff, because "Tumblr continued to [distribute the photographs] after receiving notice from [Poole] at least 7 times to take down her photographs.").

Appellate and district courts across the country have dismissed privacy claims premised on similar factual allegations. For example, in *Carafano v. Metrosplash.com, Inc*., 339 F.3d 1119 (9th Cir. 2003), the Ninth Circuit upheld the dismissal of privacy claims brought by a celebrity against a dating website that published a fake profile posted by a third party that included the plaintiff's home address, email address, and phone number. In doing so, the Court concluded that "despite the serious and utterly deplorable consequences that occurred in this case, we conclude that Congress intended that service providers such as Matchmaker be afforded immunity from suit." *Id.*, at 1125. Many other cases have reached the same conclusion. *See, e.g., Norton v. Meta Platform, Inc.,* 2026 WL 1963120, at *1 (N.D. Cal. July 7, 2026) (Section 230 barred claims against Facebook where third parties posted "intimate images" of the plaintiff); *O'Kroley v. Fastcase, Inc.,* 831 F.3d 352,

354-55 (6th Cir. 2016) (Section 230 barred claims against Google "ranging from 'libel' to 'invasion of privacy'" arising from its use of plaintiff's name in search results); *Parker v. Google, Inc.*, 422 F. Supp. 2d 492, 501 (E.D. Pa. 2006), *aff'd*, 242 F. App'x 833 (3d Cir. 2007) ("[U]nder § 230 of the CDA, Google cannot be held liable for the claims of defamation, invasion of privacy, and negligence alleged here."); *Poole,* 404 F. Supp. 3d at 640 (Section 230 barred claims arising from third-party posts of nude photographs of plaintiff).

Appellants' only response to Section 230's bar of their invasion of privacy claims is their novel theory that Appellees' publication of the Videos falls within a narrow exception for wiretapping claims under the "Electronic Communications Privacy Act of 1986" ("ECPA"). *See* App. Br. at 12-13, 58-61; 47 U.S.C. § 230(e)(4). Section 2511(1)(c) of the ECPA creates liability for a person who "intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection." However, Appellants never alleged a claim under the ECPA in any of their six complaints, which is fatal to their argument. *See Universal Commc'n Sys., Inc. v. Lycos, Inc.,* 478 F.3d 413, 421 (1st Cir. 2007) (affirming dismissal of defamation claims: "We note that liability under the ECPA is specifically exempted from Section 230 immunity… There is no

ECPA claim here."). For that matter, Appellants never even alleged that ***any conduct*** at issue in this lawsuit was a violation of that statute or constituted an unlawful wiretap. Nor do Appellants point to any exceptional circumstances or fundamental error that would justify this Court considering their new theory.

In any event, there is no basis for an ECPA claim, because Appellants never alleged that the Videos were intercepted "wire, oral, or electronic communications." They alleged only that Murphy recorded video images of Appellants "changing clothes and taking showers." That is not a wire or electronic communication. Most critically, Appellants did not allege that any ***oral*** communications were intercepted—unlike *Doe v. GTE Corp.,* 347 F.3d 655, 658 (7th Cir. 2003),[16] where the court found that "the tapes have audio as well as video tracks." Nor could they so allege, since the Videos ***do not contain any audio***, and thus do not include any

[16] Appellants' reliance on *Doe v. GTE Corp*., 347 F.3d 655, is misplaced for other reasons as well. *GTE* involved allegations that GTE and its affiliates provided web hosting services for websites that disseminated hidden-camera videos. The Court, in *dicta*, noted that the operators of the websites "intercepted and disclosed oral communications," but rejected the Appellants' effort to impose liability on the web hosting services. Additionally, while the district court held that the web host defendants were protected by Section 230, the Court of Appeals affirmed on a different ground—namely, that the provision of online hosting services was insufficient to give rise to liability under an "aiding and abetting" or secondary liability theory. Notably, the court never held that Section 230(e)(5) excludes a service provider who hosts ***third party*** "intercepted" content from the Section 230 immunities. Instead, it held that the hosting services had ***no liability*** for failing to prevent the dissemination of such content.

oral communications. *Doe v. Smith*, 429 F.3d 706, 709 (7th Cir. 2005) ("A silent film would be outside this definition [of "oral communication"].").

Finally, Appellants did not, and cannot, allege that Appellees had the requisite knowledge and intent for an ECPA claim. Instead, Appellants claimed that Appellees had received takedown notices from other women "who appeared on their websites but never consented to being filmed," 4AC ¶50, and thus they "knew or should have known" that, at a general matter, nonconsensual content was being uploaded. General knowledge of the possible existence of nonconsensual content on a platform is insufficient to give rise to an ECPA claim. *See Weeks v. Union Camp Corp.*, 215 F.3d 1323, 2000 WL 727771, at *3 (4th Cir. 2000) ("to establish use and disclosure liability…, a defendant must be shown to have been aware of the factual circumstances that would violate the statute.") quoting *Thompson v. Dulaney,* 970 F.2d 744, 749 (10th Cir.1992).

## CONCLUSION

For the foregoing reasons, the decision below should be upheld.

Respectfully submitted,
/s/ Mark Goddard

**CIAMPA FRAY-WITZER, LLP**
Evan Fray-Witzer
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Evan@CFWLegal.com
*Attorneys for Defendants-Appellees*
*Hammy Media, Ltd., d/b/a*

**TURNER, PADGET, GRAHAMAND LANEY, P.A.**
Mark Goddard
R. Hawthorne Barrett
1901 Main Street, 9th Floor
Columbia, SC 29201
Telephone: 803-227-4334
mgoddard@turnerpadget.com

*xHamster.com; Trafficstars Ltd; Wisebits IP, Ltd*

**BOSTON LAW GROUP, PC**
Valentin D. Gurvits
Frank Scardino
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
vgurvits@bostonlawgroup.com
frank@bostonlawgroup.com

*Attorneys for Defendants-Appellees Hammy Media, Ltd., d/b/a xHamster.com; Trafficstars Ltd; Wisebits IP, Ltd*

**METCALFE & ATKINSON, LLC**
Hannah Rogers Metcalfe
1395 South Church Street
Greenville, South Carolina 29605
Telephone: 864-214-2319
hmetcalfe@malawfirmsc.com

*Attorneys for Defendants-Appellees Hammy Media, Ltd., d/b/a xHamster.com; Trafficstars Ltd; Wisebits IP, Ltd*

tbarrett@turnerpadget.com

*Attorneys for Defendants-Appellees MG Freesites Ltd and MindGeek S.à r.l.*

**MITCHELL SILBERBERG & KNUPP LLP**
Theresa B. Bowman
1818 N Street NW, 7th Floor
Washington, DC 20036
Telephone: 202-355-7900
tbb@msk.com
Marc E. Mayer
Emily F. Evitt
2049 Century Park East
18th Floor
Los Angeles, California 90067
Telephone: 310-312-2000
mem@msk.com
efe@msk.com

*Attorneys for Defendants-Appellees MG Freesites Ltd and MindGeek S.à r.l.*

## REQUEST FOR ORAL ARGUMENT

Appellees request oral argument pursuant to Fed. R. App. P. 34, which provides that oral argument "must be allowed" in every case unless: (A) the appeal is frivolous; (B) the dispositive issues have been authoritatively decided; or (C) the facts and legal arguments are adequately presented in the brief and record, and the decisional process would not be significantly aided by oral argument.

Appellees respectfully submit that oral argument is warranted in this appeal. Appellants present highly impactful proposals regarding the purpose and meaning of the Communications Decency Act. Further, the district court's memorandum opinion now on appeal is nearly 80 pages long and surveys both a dense factual predicate and a complex treatment of numerous legal issues. For all of these reasons, Appellees believe "the decisional process would … be significantly aided by oral argument," and hereby requests it. *See* Fed. R. App. P. 34.

Respectfully submitted,
/s/ Mark Goddard

**CIAMPA FRAY-WITZER, LLP**
Evan Fray-Witzer
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Evan@CFWLegal.com
*Attorneys for Defendants-Appellees Hammy Media, Ltd., d/b/a xHamster.com; Trafficstars Ltd; Wisebits IP, Ltd*

**TURNER, PADGET, GRAHAMAND LANEY, P.A.**
Mark Goddard
R. Hawthorne Barrett
1901 Main Street, 9th Floor
Columbia, SC 29201
Telephone: 803-227-4334
mgoddard@turnerpadget.com
tbarrett@turnerpadget.com

*Attorneys for Defendants-Appellees*

**BOSTON LAW GROUP, PC**
Valentin D. Gurvits
Frank Scardino
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
vgurvits@bostonlawgroup.com
frank@bostonlawgroup.com

*Attorneys for Defendants-Appellees Hammy Media, Ltd., d/b/a xHamster.com; Trafficstars Ltd; Wisebits IP, Ltd*

**METCALFE & ATKINSON, LLC**
Hannah Rogers Metcalfe
1395 South Church Street
Greenville, South Carolina 29605
Telephone: 864-214-2319
hmetcalfe@malawfirmsc.com

*Attorneys for Defendants-Appellees Hammy Media, Ltd., d/b/a xHamster.com; Trafficstars Ltd; Wisebits IP, Ltd*

*MG Freesites Ltd and MindGeek S.à r.l.*

**MITCHELL SILBERBERG & KNUPP LLP**
Theresa B. Bowman
1818 N Street NW, 7th Floor
Washington, DC 20036
Telephone: 202-355-7900
tbb@msk.com
Marc E. Mayer
Emily F. Evitt
2049 Century Park East
18th Floor
Los Angeles, California 90067
Telephone: 310-312-2000
mem@msk.com
efe@msk.com

*Attorneys for Defendants-Appellees MG Freesites Ltd and MindGeek S.à r.l.*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains **12,908** words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

September 9, 2026

Respectfully submitted,
*/s/ Mark B. Goddard*
Mark B. Goddard

No. 25-2411, 25-2418

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

JANE DOES 1-10,
Plaintiffs-Appellants,

v.

MG FREESITES LTD., D/B/A/ PORNHUB.COM; HAMMY MEDIA LTD., D/B/A/ XHAMSTER.COM; MINDGEEK S.A.R.L.; TRAFFICSTARS LTD.; WISEBITS IP LTD.,
Defendants-Appellees,

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA (SPARTANBURG)
Case Nos. 7:20-cv-00947-DCC, 7:21-cv-03193-DCC
(The Honorable Donald C. Coggins Jr.)

---

CERTIFICATE OF SERVICE OF
OPENING BRIEF FOR DEFENDANTS-APPELLEES

---

I hereby certify that on September 9, 2026, the Opening Brief for Defendants-Appellees was served upon the following parties via e-mail as follows:

Deepak Gupta
Jonathan E. Taylor
Stefanie Ostrowski
Gupta Wessler LLP
2001 K Street, NW, Suite 850 North
Washington, DC 20006
deepak@guptawessler.com

J. Edward Bell, III
Gabrielle A. Sulpizio
Bell Legal Group
219 North Ridge Street
Georgetown, SC 29440
jeb@edbelllaw.com

Danielle Bianculli Pinter
Peter Gentala
National Center of Sexual Exploitation
1201 F Street NW
Washington, DC 20004
dpinter@ncoselaw.org

Tyler S. Thompson
Liz J. Shepherd
Chad Propst
Dolt, Thompson, Shepherd & Conway, PSC
13800 Lake Point Circle
Louisville, KY 40223
tthompson@kytrial.com

September 9, 2026
Columbia, South Carolina